Russell **VELUZAT**, Administrator of the Estate of Lonnie V. Bradley, Deceased, Appellant,

v.

Joseph L. **JANES** et al., Appellees.

Court of Appeals of Kentucky.

Nov. 27, 1970.

Rehearing Denied Feb. 12, 1971.

Lee S. Jones, Louisville, for appellant.

William Goldberg, Louisville, for appellees.

CULLEN, Commissioner.

Joseph Janes and wife filed a claim against the estate of Lonnie V. Bradley, deceased, on an alleged "oral express contract" under which, in return for "care and services" rendered to him by the Janeses, Bradley promised to devise to them a house at 1123 Minors Lane, in Louisville, having a value of $15,500, and by his will, to cancel a note which the Janeses owed to Bradley. They alleged a breach of the contract in that Bradley did not so provide in his will, but they did not seek specific performance as to the real estate; rather they sought judgment for the alleged value of the real estate.

A similar claim was filed by Joseph Pirrman and wife, asserting that Bradley, by oral express contract, had promised, in return for care and services, to devise to them a house at 5266 Southern Parkway in Louisville, valued at $17,000, and further had promised in return for the Pirrmans' agreement to take care of Bradley's dog, after his

death, so long as the dog should live, to pay them the reasonable value of such services, which they alleged to be $3,750. The Pirrmans (as did the Janeses) sought judgment for the alleged value of the house, and sought judgment for the alleged value of the services in caring for the dog.

In an action brought by the administrator, with will annexed, of Bradley's estate, for a settlement of the estate, the Janeses and the Pirrmans were called upon to, and did, plead their claims. The administrator's defense to the claims was a general denial.

Proof was heard before a commissioner, who reported his recommendation that the claims be denied. On exceptions to the report, however, the circuit court gave judgment for the claimants for the full amounts of their claims, except as to the claim of the Janeses for cancellation of the note owed by them, which was disallowed. The administrator has appealed from that judgment, asserting as his principal ground of error that there was insufficient proof to sustain recovery on the claims.

As noted, each of the claims was based on an alleged "oral express contract." Such contracts (if proved) are enforcible except that if the Statute of Frauds is pleaded against them, they are not specifically enforcible if they embrace real estate. In the latter case, if the value of the services rendered cannot be measured in money, relief equivalent to specific performance can be granted, allowing recovery of the thing promised. But if the value of the services can be measured in money, the claimant is entitled to recover only the *proved* value of the services, the right to recover being based on a contract implied in law, that is, one raised by equity to give some relief to a claimant who has performed valuable services under a contract which cannot be enforced because of the Statute of Frauds. Authority for these propositions is set forth in Cheshire v. Barbour, Ky., 455 S.W.2d 62.

In the instant case the claimants, apparently conceding the bar of the Statute of Frauds (which was not in fact pleaded), did not seek specific performance of the alleged contracts to devise the houses, but instead sought judgment for the values of the houses. Under *Cheshire,* they were not entitled to such a recovery (assuming they proved the contracts) unless the value of the services rendered by them could not be measured in money. The fact is that the value of their services could be measured in money, because the services they rendered were of substantially the same type as those in *Cheshire,* the value of which was held to be measurable in money. The claimants in the instant case made no effort to prove the value of their services (except as to the dog, which separate claim we shall discuss later). Therefore, the proof did not sustain any recovery for those services. (As a matter of fact, the claimants did not even undertake to prove the alleged values of the houses, so they did not prove their claims even on the erroneous theory of recovery on which they were proceeding.)

If failure to prove the value of the services (again excepting the claim as to the dog) were the only deficiency in the claimant's cases, we would be inclined to remand the cases, as we did in *Cheshire* and for the same reason, for a trial upon which proof of the value of the services could be presented. But there is a more serious, and fatal, deficiency, in that there was a failure of proof that there even were any *contracts* to begin with.

Of course the contracts could be established by *circumstantial* evidence, but the evidence must establish the essential elements of a *contract.* There must be at least some semblance of definiteness as to what services were to be rendered, when they were to begin and how long they were to last, and what was promised in recompense for the services. As said in Finn v. Finn's Adm'r, Ky., 244 S.W.2d 435, "It must be clear and certain that there was in fact

an agreement, positively definite and mutually understood." The evidence must disclose on the part of the promisor an intent to assume a legal obligation capable of being enforced against him. Oliver v. Gardner, 192 Ky. 89, 232 S.W. 418. The evidence further must establish that the person rendering the services *expected compensation* for the services. Marshall v. Ireland, 228 Ky. 354, 15 S.W.2d 289. It is true that where the parties to the alleged contract are not related by blood or marriage there is no presumption that the services were gratuitous, Sword v. Moore's Adm'r, 303 Ky. 507, 198 S.W.2d 215, but on the other hand the lack of such relationship does not give rise to any presumption that the services were *not* gratuitous.

With the foregoing principles in mind we shall review the evidence (saving for later the evidence on the dog question).

Mr. Bradley died in December 1964, at age 71, eight months after his wife's death in April. He had suffered a stroke in February 1962 and had been incapacitated since that time. He had been a railroad employe, had owned a filling station and had acquired a number of residential properties. His estate at the time of his death had an estimated value of $76,000. He had retired in 1957, but was active until suffering the stroke in February 1962.

The Janeses, a younger couple, became friends of the Bradleys in *1937*. The Pirrmans, also a younger couple, became friends of both the Bradleys and the Janeses in *1955*. From 1955 to 1962 the Bradleys moved four times, but the friendships with the Janeses and the Pirrmans continued.

The evidence as to the kinds of services which the Janeses and the Pirrmans rendered to the Bradleys covered the period from 1955 to 1964. The services consisted of yard and garden work; installing and connecting household appliances; assisting the Bradleys in moving; taking the Bradleys to the grocery, the doctor or the hospital, and for pleasure rides; helping to move Mr. Bradley in and out of bed after his stroke; preparing tax returns; and maintenance care of rental property. The services were rendered intermittently and not on any regularly scheduled basis, and there appears to have been no distinction between the services rendered by the Janeses and those rendered by the Pirrmans, except that for a time it appeared that the Janeses performed some maintenance services for one piece of rental property and the Pirrmans for another piece.

A neighbor of the Bradleys testified that in 1958 or 1959 the Bradleys told her "how wonderful Alene and Jay (the Janeses) had been to them. They were like children to them, even closer than a lot of children were to their parents. And for a reward for them, they were going to leave them the house on Minors Lane and they thought that they deserved it. At any hour of the night, they called them, they were always there and whenever they were sick and they always waited on them like children should do their parents. * * * they were , really better to them than a lot of people's own children were and * * * they were always waiting on them." When asked whether the Bradleys *paid* the Janeses for their services, the witness said: "I—well, I wouldn't think so, because the Janeses don't accept money for favors they do for people. * * * they favor their neighbors and help them out * * * They do anything for anyone that is sick." She further said, "It was more or less like a family like children were for their parents."

*Mrs. Pirrman*, testifying for the *Janeses*, said that in 1960 Mr. Bradley told her that "he wanted Alene and Jay Janes to have the property on Minors Lane because they had, they were taking care of the property and it was taking a load off of their shoulders and that they was, wanted to will them that house up there." She further testified that on another occasion the Bradleys told her: "That the Janeses were to get the house on Minors Lane, because they had, they was taking care of the house at that time. In fact they had taken care of the house since 1950." However, Mrs. Pirrman

testified that on a prior occasion the Bradleys, referring to a house they were then living in on *Outer Loop*, said: "I guess we'll get rid of it when we get this fixed up, because Alene and Jay (the Janeses) likes it and I guess they will be happy with it." Also, she testified that the Bradleys, referring to the house on *Minors Lane*, told her: "One time you, Joe (the Pirrmans) was supposed to get this house because he liked it, but we have willed it to the Janeses now. * * * that Alene and Jay was going to get the house out there. That at one time, it was willed to Joe. * * * Because he liked it, but Joe, but that it was willed to Alene and Jay now, because they was taking care of the house out there." When asked whether the conversation was with respect to the house *and services*, Mrs. Pirrman's reply was: "I don't guess we was talking about services." Mrs. Pirrman said that when she and her husband first became acquainted with the Bradleys and the Janeses, in *1955*, "we thought they were their children until we got better acquainted with them and found out that they were, they were friends." When asked whether the Bradleys *paid* the Janeses for their services, she said: "No, because they just called on Alene and Jay to do things for them like they were their children. I mean, they wouldn't— * * * Well, I know she didn't give them any money and I just know they didn't because they just expected them to do it like they were their children, like if your mother and father would call on you to do something for them." That Mr. Janes was not paid, although possibly reimbursed for materials used, "because he didn't take money for anything." In answer to a specific question as to whether the "Janeses were doing those chores for the Bradleys expecting to be paid, compensated for what they were doing," Mrs. Pirrman said: "I imagine that the Janeses felt like that it would, just like it would be their parents, that they just knew that they would inherit because that was the understanding that we had." That checks given by the Bradleys to Mr. Janes "must have been for, for supplies, because Jay wouldn't have took the money. I mean, just for labor. I know he wouldn't."

The Janeses' daughter testified that on an occasion in 1959 Mr. Bradley said that "some day he and Mrs. Bradley wanted Mother and Daddy to have the house when they were gone, across the street" but that he made no statements as to "why he wanted them to have that property." She testified that the house referred to was one on *Outer Loop* (not the one on Minors Lane which is the subject of the contract alleged by the Janeses in this action).

A long-time friend of the Bradleys testified that on one occasion when Mrs. Bradley asked the friend to be administratrix of her estate, Mrs. Bradley said: "I, I want the people that have been good to me and done for me to have what—for us, for us, for us what we have * * * Those people (not identified) have been good to us and we want them to have what we have."

Mr. Pirrman testified that on an occasion in 1961 Mr. Bradley, with reference to the house on Minors Lane, said: "I ordered the hot water tank and I'm going to let * * * Jay Janes install it himself, because it would be that much benefit to him * * * putting in the hot water tank * * * would be to his benefit in the house."

Mrs. Janes testified on behalf of the Pirrmans. She told of an incident in 1960, when Mr. Bradley said: "I guess I will, we are going to leave this place to Joe and Sylvia (the Pirrmans) since they are working so hard here." She said that the house referred to was one on *New Cut Road* (not the one on Southern Parkway which was the subject of the contract alleged by the Pirrmans in this action). That later, after the Bradleys had moved to Southern Parkway, Mr. Bradley said: "Well, Cora, she (Mrs. Pirrman) will love this one too. We will just leave her this one." She further testified that in 1962, when the Bradleys were about to depart on a trip to Florida, Mr. Bradley said (to Mrs. Janes): "If anything happens to us on this trip the house on

Southern Parkway is the Pirrmans' and you know the Minors Lane is all yours." She testified that the Bradleys considered the Pirrmans "as their children" and treated them "as if they were their children."

Mr. Janes testified also for the Pirrmans. He testified that on an occasion when Mr. Pirrman had done work in the yard of the house on *New Cut Road* Mr. Bradley said: "Well, they will get paid well for the work, because they will get this place sometime." He further testified that later, after the Bradleys had moved to Southern Parkway, Mr. Bradley said: "Joe and Sylvia needn't worry, * * * they will get this house, the one that we are at on Southern Parkway." Mr. Janes said that the Pirrmans "were more like probably a son and daughter" to the Bradleys.

In addition to the foregoing testimony there was introduced in evidence a testamentary document executed by *Mrs.* Bradley in 1962, in which she undertook to dispose of her estate in the event she should survive her husband (which she did not do), and at the bottom of which Mr. Bradley had written and signed an endorsement to the effect that the document "is also my wishes." Admittedly the document did not constitute a valid testamentary disposition by Mr. Bradley, but it was introduced as purported corroboration of the existence of the contracts alleged by the Janeses and the Pirrmans. The document made some 20 bequests to relatives, friends, charities and the church. As to the Pirrmans, it said: "I want our house at 5266 Southern Parkway to go to our good friends Joseph M. & Sylvia Pirrman * * * Income from 5506 Southside Drive (note) to Mr. & Mrs. Joseph M. Pirrman." As to the Janeses the document said: "The home at 1123 Minors Lane and all other notes, cash or other property to Joseph L. Janes and his wife, Alene Janes."

The foregoing is all of the evidence having relevance to the existence of the alleged contracts (again except with reference to the dog). We think the evidence warrants the conclusion that the Bradleys wanted the Pirrmans to receive the house on Southern Parkway, and the proceeds of a note; they wanted and intended the Janeses to receive the house on Minors Lane, *and the residue of their estate*; and the Janeses and the Pirrmans expected to *inherit* something from the Bradleys. But we can find no evidence to warrant a finding of any *contractual* relationship.

With reference to what the Bradleys were to leave to the Janeses and the Pirrmans, under the alleged contracts, it is to be noted that the Bradleys first said that they were going to give the Janeses a house on Outer Loop and the Pirrmans a house on Newcut Road. Later, the Bradleys decided that, instead they would give the Janeses the house on Minors Lane (although the record indicates that the latter house was worth $5,500 less than the one on Outer Loop), and would give the Pirrmans the one on Southern Parkway (the one on Newcut Road having been sold for some undisclosed amount). It is to be noted also that the testamentary document executed by Mrs. Bradley undertook to give the Pirrmans the proceeds of a note in addition to the house on Southern Parkway, and to give the Janeses the *entire residue* of the estate in addition to the house on Minors Lane. This evidence is not consistent with the existence of *contracts* but is consistent with the existence of the intent by the Bradleys to make testamentary *gifts* to the Janeses and the Pirrmans out of *gratitude* and in *appreciation* of their attentiveness and kindness. It is clear from the evidence that the Bradleys at all times considered that the choice of what and how much they would leave to the Janeses and the Pirrmans was *their* (the Bradleys') choice.

There is an equal absence of contractual elements with reference to what services the Janeses and Pirrmans were to be compensated for. There was testimony that the Janeses were to receive the house on Minors Lane because they had taken care and were taking care of that house. If so, why then had the Bradleys previously intended

to give the Janeses the house on Outer Loop? Why also were the Janeses cut down from the promise of a $21,000 house to one worth only $15,500? Likewise, if the Pirrmans were to be given the house on New Cut Road because "they had worked so hard there," why were they to be given the house on Southern Parkway? The evidence shows that the Janeses had known the Bradleys since *1937* and had become so close to them that when the Pirrmans first met the two couples they thought the Janeses were the Bradleys' children. Why then would the Pirrmans be promised a $17,000 house but the Janeses one worth only $15,500? If the Janeses and the Pirrmans were to be given the houses on Southern Parkway and on Minors Lane because of their work in taking care of those houses, respectively, was it intended that only those services were to be compensated for and all of the other services, such as driving the Bradleys to various places, helping in Mr. Bradley's care when he was bedfast, etc., were not to be compensated for?

The claims of contracts fail also in respect to the element of the expectation by the Janeses and the Pirrmans that they would be paid for their services. The evidence shows that the Janeses and the Pirrmans rendered the services as friends and neighbors, and out of affection such as that of children for their parents; that the Janeses and Pirrmans were not the kind of people who would take pay for helping a neighbor. The only evidence as to what the Janeses and the Pirrmans expected was that they would *inherit*, "just like it would be their parents." We think those words, of Mrs. Janes', express exactly the relationship and what all of the parties expected. The Janeses and the Pirrmans thought that they would receive testamentary dispositions from the Bradleys as would children from parents—not by way of the meeting of a contractual obligation but out of gratitude, appreciation and love—that they would receive what the Bradleys in testamentary disposition chose to give them.

The circuit court appears to have given considerable weight to the testamentary document executed by Mrs. Bradley, as evidence of contract. The document contains no words even remotely suggesting that the devises to the Janeses and the Pirrmans had any contractual origin or basis. It furnished no evidence at all of a contract. See Gibson v. Crawford, 247 Ky. 228, 56 S.W.2d 985; Annotation, 94 A.L.R.2d 921; Cheshire v. Barbour, Ky., 455 S.W.2d 62. The reliance by the trial court on Strong v. Whicker, 274 Ky. 10, 117 S.W.2d 1017, is misplaced, because there the will stated that the property was being devised to the claimant "for taking care of my husband and myself in our old days."

Our conclusion is that the evidence does not sustain the recoveries on the claims with respect to the houses alleged to have been contracted to be devised.

We come now to the claim for care of the dog.

The dog, a Chihuahua, was a beloved pet of the Bradleys. After Mrs. Bradley's death, Mrs. Pirrman took the dog and thereafter cared for it. No testimony was admitted as to any understanding with respect to the terms on which Mrs. Pirrman took the dog, because Mrs. Pirrman's own testimony was rejected under the "Dead Man's Statute" and no one else tendered any testimony on the subject. There was, however, a reference to the dog in the testamentary document executed by Mrs. Bradley. The reference was: "We also want Mr. & Mrs. Pirrman to take our dog and take good care of her." From this bare reference to the desire of the Bradleys we cannot derive any indication of a contractual understanding that the Pirrmans were to be *paid* for taking care of the dog. We are dealing here with inferences, and since contracts to pay people for caring for dogs after the owners' deaths are rare, we think it would take a fairly strong inference to warrant a finding of the existence of such a contract.

The judgment is reversed with directions to enter judgment denying in toto the claims of the Janeses and the Pirrmans.

All concur except STEINFELD, J., who dissents.

STEINFELD, Judge (dissenting).

I concur in the opinion of the majority except that part which directs entry of a judgment denying the claims and the language which supports that order. A decision in this case was withheld pending decision in Cheshire v. Barbour, Ky., 455 S. W.2d 62 (1970). There we admitted utter confusion existed in the case law governing this type of action in this and in other states. We said: "We think justice dictates that the plaintiff herein be given another chance." I cannot distinguish this proceeding from Cheshire v. Barbour, supra. Equal protection dictates that the Janeses and the Pirrmans have the same opportunity.