**BDT PRODUCTS, INC.
et al., Plaintiffs,**

v.

**LEXMARK INTERNATIONAL,
INC. et al., Defendants.**

**No. CIV.A. 99–61–JMH.**

United States District Court,
E.D. Kentucky,
Lexington.

July 31, 2003.

Michael R. Adele, Cooley Godward LLP, San Diego, CA, Charles S. Kratzer, III, Lexmark Intern., Inc., Intellectual Property Law Dept., Lexington, KY, William M. Lear, Jr., William L. Montague, Jr., John B. Park, Charles E. Shivel, Jr., Richard B. Warne, Stoll, Keenon & Park, LLP, Lexington, KY, John T. Ryan, Stephen P. Swinton, Philip C. Tencer, Cooley Godward LLP, San Diego, CA, for Lexmark Intern., Inc.

Joe B. Campbell, Law Offices of Joe B. Campbell, Bowling Green, KY, for BDT Products, Inc., Buro-Datentechnik GMBH & Co. KG.

Steven Davis, Higgs, Fletcher & Mack, LLP, San Diego, CA, Matthew V. Herron, Meisenheimer, Herron & Steele, San Diego, CA, for BDT Products, Inc.

John L. Morrell, Higgs, FLetcher & Mack LLP, San Diego, CA, for John L. Morrell.

John Morris, Higgs, FLetcher & Mack LLP, San Diego, CA, for BDT Products, Inc.

James M. Peterson, Higgs, Fletcher & Mack LLP, San Diego, CA, Don A. Pisacano, Rambicure, Miller & Kuebler, PSC, Lexington, KY, Phillip C. Samouris, Higgs, Fletcher & Mack LLP, San Diego, CA, Robert M. Steele, Meisenheimer, Herron & Steele, San Diego, CA, Susanne E. Washington, Foley & Lardner, San Diego, CA, for BDT Products, Inc.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This matter is before the Court on Defendant Lexmark International, Inc.'s ("Lexmark's") motions for summary judgment [Record Nos. 304 & 305]. Fully briefed, Defendant's motions are ripe for review.

### I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The following are the relevant facts, viewed—as they must—in the light most favorable to plaintiff.

Plaintiffs (collectively "BDT") are experts in the design and manufacture of paper handling systems and, as such, have solved difficult paper-handling challenges for the largest printer companies in the world. Plaintiffs allegedly invented and perfected the technology which Lexmark

used as part of the paper handling system of its Optra S printer. In this case BDT alleges that Lexmark seeks to avoid paying for the use of Plaintiffs' trade secrets disclosed in confidence over a period of almost three years.

In May 1997, Lexmark announced the introduction of its Optra S line of printers, which included a standard 250–sheet paper tray. This design was a substantial departure from Lexmark's existing paper handling system. Previously, Lexmark had used a lift-plate system, which incorporated a spring attached to the metal plate, which raised the paper to printer input. The system separated the paper with a metal corner-separator which caused each individual sheet to snap away from the stack. The new system, which Lexmark used for the first time in the Optra S, did not use a lift plate or a corner-separator. In their place, the Optra S separated the paper with an arm which dropped down into the tray and moved the paper forward against an angled dam, which then directed the paper from the top of the stack to the printer. In the place of a corner-separator, the individual sheets of paper were separated from the stack by the forward force applied by the arm to the top sheet. This design eliminated the need for springs, lift plates, or corner separators and allowed the tray to be made without any moving parts.

Lexmark's engineers described the Optra S paper handling system as a "fundamentally significant change" over the former design, and its marketing department described the new system as a "dramatic improvement." Lexmark not only touted the new technology as revolutionary, it also claimed that the new trays were "Even More Reliable Than Ever." Visually, however, Lexmark's "revolutionary" tray was nearly identical to the tray that Plaintiffs designed and built for Hewlett Packard.

Over the years, the parties interacted closely. While a detailed description of the extensive interaction between the parties would be laborious, an overview is needed to place their cooperation and agreements in proper context.

Plaintiffs' technical disclosures concerning the angled-dam tray started in March 1993 in Germany in a confidential demonstration of Plaintiffs' prototype and ended in early 1996, when Lexmark informed Plaintiffs that Lexmark was no longer interested in receiving information from Plaintiffs on this technology. During this period, which spanned almost three years, Plaintiffs disclosed its technology, and Lexmark—whether based on Plaintiffs' disclosures or its own development—decided to abandon its existing design and use an angled-dam tray for the Optra S. Plaintiffs made their disclosures because they believed that Lexmark would purchase products which incorporated Plaintiffs' technology in Lexmark printers, just as Plaintiffs had designed and manufactured paper handling systems for other companies, such as Hewlett Packard. Lexmark's employees admit these disclosures were confidential and were treated as such.

Lexmark asked for, and received, far more than simply a demonstration of the prototypes. As a result, Plaintiffs eventually provided: details about the technology, an appraisal of the technology's commercial feasibility in application, test results, prototypes, unannounced product materials, detailed explanations of the theory of operation, and a technical explanation of how to control multiple input and output sources.

Seeing the technology and making it work reliably were two different things, however, and Lexmark, new to this design, continued to seek help from Plaintiffs well into 1995, (over a year after Lexmark decided to implement the design). Although

Lexmark claims that its own engineers invented a paper separation arm, which it dubbed the "autocompensator," and incorporated that arm to the angled-dam tray, Plaintiffs allege that Defendant's new technology was based on Plaintiffs trade secrets. To put it simply, Lexmark claims that its engineers worked their way, on their own, to this design; BDT, however, argues that "both the direct and the circumstantial evidence leads to the conclusion that Lexmark used Plaintiffs' information to adopt and implement the angled-tray design for the Optra S printer." This question is at the core of the instant litigation.

Critical to the Court's disposition of this case are the series of agreements executed between the parties between 1990 and 1996. During this period, Lexmark and BDT executed seven confidentiality agreements concerning the disclosure of information. While certain provisions differ somewhat from agreement to agreement, at least one recurs—each agreement expressly provided that Lexmark was free to use information provided to Lexmark by BDT.

The parties entered into four agreements labeled as "Confidential Disclosure Agreement(s)." These agreements were labeled as "disclosure" agreements because only one party, Lexmark, received protection with regard to disclosed information. All four of those agreements expressly provided in section 9 that Lexmark could freely use any information, confidential or otherwise, that BDT disclosed to Lexmark. Section 9 reads:

9. In connection with this agreement, Lexmark does not wish to receive any information which may be considered confidential or proprietary by CONTRACTOR [defined earlier as "BDT"]. Accordingly, except with respect to the rights of CONTRACTOR under valid patents and copyrights, no obligation of

any kind is assumed by or is to be implied against Lexmark by virtue of Lexmark's discussions with CONTRACTOR or with respect to any information received (in whatever form) from CONTRACTOR and Lexmark will be free to reproduce, use and disclose such information to others without limitation. Moreover, discussions and/or correspondence, or other activities under this agreement shall not in any respect, impair the right of Lexmark to make, procure, or market products or services now or in the future which may be competitive with those offered by CONTRACTOR. The above terms control over any language that may be contained in any sign-in or visitor's log at CONTRACTOR'S facility.

The parties also entered into three additional agreements, entitled "Confidential Exchange Agreement(s)." These were two-way confidentiality agreements in which both sides would be exchanging confidential information. Two of these agreements contained an express disclaimer in section 3 providing that despite a general obligation not to disclose confidential information, both parties were free to use any confidential information disclosed under the agreement by the other party:

3. Except with respect to rights under valid patents and copyrights, Recipient shall be free to use any such Confidential Information provided by Discloser subject only to the obligation not to disclose, publish or disseminate such Confidential Information during the foregoing specified period of confidentiality.

Likewise, the last Confidential Exchange Agreement contained a similar provision:

Except with respect to rights under valid patents, the receiving party shall be free to use any such Confidential Information provided by the disclosing party,

any reports and written documentation prepared by the receiving party, and any ideas, concepts and/or techniques contained in any such Confidential Information for any purpose including the use of such Information in the development, manufacture, marketing and maintenance of its products and services, subject only to the obligation not to disclose, publish or disseminate such Confidential Information during such foregoing specified period of confidentiality.

In 1993 and 1994, BDT disclosed its alleged trade secrets to two competitors of Lexmark, Hewlett Packard Guadalajara and a division of Xerox then known as Tektronix, Inc. BDT freely disclosed its alleged trade secrets to both of these two Lexmark competitors under agreements that failed to impose any obligation of confidentiality regarding, or restriction on the use of, BDT's information. In particular, BDT did not in writing obligate either Hewlett Packard or Tektronix to keep BDT's information secret. In fact, BDT did not take any steps (such as confidentiality agreements prohibiting these entities from disclosing or using BDT's confidential information) whatsoever to protect its purported trade secrets.

On or about September 1993, after months of discussions concerning the BDT System, BDT began to develop an auxiliary tray that ultimately became the 500–sheet auxiliary tray for Hewlett Packard's "HP4v" printer, which Hewlett Packard revealed and released to the public in 1994. The HP4v tray was the first commercial tray to embody every component of the BDT System that is at issue in this case. According to Mr. Friedhelm Steinhilber, who is the Geshattfurher of Plaintiff Buro-Datentechnik GmbH & Co. KG (akin to a chief executive officer), BDT "perfected the BDT System" during its development of the HP4v tray.

Hewlett Packard Guadalajara and BDT signed an agreement to govern the exchange of information for the HP4v tray project on October 7, 1993, effective July 6, 1993 ("July 6 CDA"). The July 6 CDA was a one-way confidential disclosure agreement—it protected the confidences of Hewlett Packard only, and not those of BDT.

During the same 1993–94 timeframe, BDT was also disclosing the BDT System to Tektronix, later to become a subsidiary of Xerox. On or about October 1993, after months of discussions concerning the BDT System, BDT made a formal proposal to develop auxiliary trays for the Tektronix Phaser 340 color printer ("Tektronix tray"). The Tektronix tray displayed and embodied the very same BDT System.

BDT and Tektronix executed two separate agreements to govern the disclosure of confidential information during the Tektronix tray project. On July 13, 1993, BDT and Tektronix executed a Confidential Information Agreement on the subject of "paper feeders and trays" that governed disclosures made during development of the Tektronix tray. As with the HP4v tray project, the confidentiality agreement between BDT and Tektronix was a "one-way" confidentiality agreement specifically drafted to protect only Tektronix information and not BDT information.

On February 4, 1994, BDT and Tektronix also executed the development contract for the Tektronix tray ("Tektronix Development Agreement"). The Tektronix Development Agreement also contained a confidentiality provision and provided that BDT would protect Tektronix's information, but did not obligate Tektronix to protect any information disclosed by BDT.

As with the HP4v project, BDT disclosed information to Tektronix in developing the Tektronix tray. BDT sent the first prototype of the Tektronix tray to Tektro-

nix prior to February 7, 1994. The prototype Tektronix trays embodied the BDT system, and during the development phase of the Tektronix tray, Tektronix thoroughly examined the design of the BDT System trays provided by BDT to ensure that the design worked.

BDT originally asserted five causes of action, each of which was premised on Lexmark's alleged misappropriation of BDT's purported trade secrets. On March 11, 2003, the Court issued a Memorandum Opinion and Order finding that Kentucky law applied and dismissing with prejudice BDT's second, fourth, and fifth causes of action.[1] Thus, only Plaintiffs' first and third causes of action remain. BDT's first cause of action alleges an implied-in-fact contract arising from an alleged agreement reached at a trade show;[2] BDT's third cause of action alleges trade secret misappropriation.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–52, 106 S.Ct. 2505). Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. PLAINTIFFS' FIRST CAUSE OF ACTION [3]

In support of its First Cause of Action, BDT alleges that it invested substantial resources in research and design on behalf of Lexmark and disclosed its purported trade secrets and know-how to Lexmark "with a reasonable expectation" that "Lex-

---

1. Plaintiffs filed a Motion for Reconsideration [Record No. 301] of the Court's Order granting Defendant summary judgment on Plaintiffs' second, fourth, and fifth causes of action. In their motion, however, Plaintiffs requested that the Court defer its ruling on the applicability of German law to the alleged tradeshow disclosure until the Court has ruled on the instant motion(s) for summary judgment. (It was suggested that the two could be intertwined.) The matter of the potential applicability of German law having not been raised in the parties' briefings, however, the issue is moot.

2. Considerable confusion has arisen respecting just what Plaintiffs' are alleging in their first cause of action. Plaintiffs' amended complaint seems to say one thing, while Plaintiffs' briefs suggest something else. The Court defers to the pleadings. *See* discussion, *infra* Part III.A.

3. The Court recognizes that a good deal of confusion has arisen on account of Plaintiffs' statement in its opposition to Defendant's motion for summary judgment that "Plaintiffs are not suing to enforce the agreement itself, but have relied on the agreement only to confirm [that] the disclosures of Plaintiffs technology were understood to be confidential...." Whatever is meant by this statement, the Court defers to the pleadings, which are captioned "Breach of Contract (Implied–in–Fact)." Hence the following contractual analysis.

mark would not use or develop BDT's technology without the consent and approval of BDT and that Lexmark would conclude a joint development and manufacturing agreement with BDT." BDT acknowledges that "Lexmark did not sign such a written agreement." BDT nevertheless claims that Lexmark breached a contract implied-in-fact to compensate BDT for its purported trade secrets with the understanding that BDT would be compensated if its technology were incorporated into Lexmark's products. BDT contends that it suffered a "loss of profits from the anticipated agreements with Lexmark."

■ Plaintiffs' claim must fail, however. A contract implied-in-fact is not an "anticipated" contract but rather a true contract that "requires an actual agreement or meeting of the minds although not expressed." *Kellum v. Browning's Adm'r*, 231 Ky. 308, 21 S.W.2d 459, 466 (1929); *see also Oliver v. Gardner*, 192 Ky. 89, 232 S.W. 418, 420 (1921) (holding that proof must show "that both the party rendering the service and the one receiving it expected and understood that compensation would be made") (citation omitted). A contract implied-in-fact differs from an express contract only "in the character and quantum of proof necessary to establish them." *Kellum*, 21 S.W.2d at 463. Specifically:

> An express contract is one wherein all the terms and conditions between the parties are set forth while in an implied contract some one or more of the terms or conditions are implied from the conduct of the parties. The former speaks for itself, while a contract implied in fact is one inferred from the circumstances or acts of the parties.

*Dorton v. Ashland Oil & Refining Co.*, 303 Ky. 279, 281, 197 S.W.2d 274 (1946). *See also, e.g., Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky.App.1987)(holding

that a contract implied-in-fact is "shown by evidence of facts and circumstances from which a meeting of minds concerning the mutual promises may be reasonably deduced")(citing *Thompson v. Hunter's Ex'r*, 269 S.W.2d 266 (Ky.1954)).

Because parties do not expressly agree to the terms of an implied contract, the "circumstances must be sufficient to clearly and convincingly manifest or prove a mutual assent of minds to enter into the contract sought to be implied or established." *Kellum*, 21 S.W.2d at 463. As stated by Kentucky's highest court, to establish the existence of a contract implied-in-fact, plaintiff must meet a higher standard:

> [An implied-in-fact contract] requires stricter proof . . . than to establish ordinary contracts—more than proof of performance of the services and casual, indefinite expressions of an intention to pay for same, or acknowledgement of gratitude or dependence on the part of the recipient, or expressions of a wish or desire that the server or attendant should be compensated, for cases of this character are pregnant with danger of spoliation.

*Id.* at 464.

■ And while an implied-in-fact contract may be established by circumstantial evidence, such evidence nonetheless "must establish the essential elements of a contract." *Veluzat v. Janes*, 462 S.W.2d 194, 196 (Ky.1970) (emphasis in original). As explained by the court in *Veluzat:*

> There must be at least some semblance of definiteness as to what services were to be rendered, when they were to begin and how long they were to last, and what was promised in recompense for the services. As said in *Finn v. Finn's Adm'r*, 244 S.W.2d 435, "It must be clear and certain that there was in fact an agreement, positively definite and

mutually understood." The evidence must disclose on the part of the promisor an intent to assume a legal obligation capable of being enforced against him. *Oliver v. Gardner,* 192 Ky. 89, 232 S.W. 418. The evidence further must establish that the person rendering the services expected compensation for the services. *Marshall v. Ireland,* 228 Ky. 354, 15 S.W.2d 289.

Id. at 196–97.

Moreover, the parties must agree "on all material and essential terms and leave nothing to be agreed upon as a result of future negotiations." *Walker v. Keith,* 382 S.W.2d 198, 201 (Ky.1964)(quoting *Johnson v. Lowery,* 270 S.W.2d 943, 946 (Ky. 1954)); *see also Computer Consulting & Network Design, Inc. v. International Business Machines Corp.,* 184 F.Supp.2d 618, 621 (W.D.Ky.2002). As the United States Court of Appeals for the Sixth Circuit has explained:

> If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement, even though the negotiations evidence a complete willingness, or even an announced determination, to agree in the future upon such issues as might subsequently arise, it must still follow that a valid and binding contract was not made.

*National Bank of Kentucky v. Louisville Trust Co.,* 67 F.2d 97, 102 (6th Cir.1933)(applying Kentucky law).

▪ In the present case, the circumstances and the acts of the parties reveal that there was never any meeting of the minds concerning a development or manufacturing contract. Rather, the evidence is that preliminary negotiations over a possible contract or contracts occurred. As BDT's pleadings themselves acknowledge by the plea for damages relating to the "anticipated agreements with Lexmark," and as BDT's own subsequent testimony

establishes, the parties never reached an agreement on essential and material terms. Therefore, no contract—express or implied—was ever formed.

BDT's principal, Mr. Klein, testified that the parties started discussing the possibility of entering into a development agreement in early 1994. By February 1995, discussions were focused on the possibility that BDT would develop a high-capacity output device for Lexmark's Optra L printer, which contained a Canon P550 printer engine, and high-capacity input and output devices for Lexmark's Optra R printer. The parties also generally discussed a possible development agreement for input and output devices for a future line of printers that would ultimately become known as the Optra S family of printers.

In late March or early April of 1995, BDT sent Lexmark a draft development agreement to begin the process of negotiating the terms and conditions of the possible contract. In fact, Mr. Klein admitted that although BDT expected to enter into an agreement with Lexmark, BDT understood that the parties had not yet reached an agreement at this point.

In an effort to win Lexmark's business, BDT also supplied Lexmark with two prototypes of an output device for possible use with a Lexmark printer. Mr. Steinhilber conceded that BDT did this at its own expense, for the purpose of marketing their products to Lexmark. Mr. Steinhilber further conceded that BDT understood that it would not recoup the cost of developing these prototypes unless and until BDT and Lexmark entered into an agreement. *Id.*

Over the course of the next several months, the parties continued to negotiate the terms and conditions of possible contracts. By June 1995, the parties had expanded the scope of their negotiations to

include not only BDT development efforts but also the possibility that BDT would manufacture and sell devices to Lexmark. The parties exchanged incomplete draft contracts during the negotiations, but never reached an agreement on the terms and conditions thereof. As Mr. Klein acknowledged, "there was not an agreement yet."

The parties suspended negotiations in early July 1995. Mr. Klein testified that as of the time of this suspension of negotiations in July 1995, he "had an extremely high level of confidence" that the parties eventually would reach an agreement respecting the various products that were being discussed at the time. Confidence that an agreement may be reached in the future, however, is not tantamount to reaching an agreement. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 790 (W.D.Ky.2001). As Mr. Klein admitted, at this point "there was not a finalized—a finalized agreement, but [BDT] continued to go on as if there would be."

The parties resumed negotiations in mid-August and continued to exchange draft proposals. In September 1995, Mr. Klein, along with Doug Bass, traveled to Lexington, Kentucky to meet with Ben Streepey and Eric Sonday of Lexmark to discuss potential projects. As of that meeting, the parties were still in negotiations and BDT understood that no agreement had been reached.

At the September meeting, Mr. Klein informed Mr. Streepey that BDT could not develop a high-capacity output mailbox for the Optra L printer (Canon P550 engine) within the time requested by Lexmark because of BDT's pre-existing commitments to Lexmark's chief competitor, Hewlett–Packard. Lexmark did not find this satisfactory. Mr. Klein testified that after this meeting, BDT had "zero" expectation of "entering into a contract for the high-capacity output device for the P550," but

still thought that BDT had "a good chance of winning" a contract to develop input and output devices for the Optra R. Shortly thereafter, Mr. Sonday telephoned Mr. Klein and informed him that Lexmark was terminating all negotiations with BDT.

Doug Bass, BDT's account manager for Lexmark at the time, confirmed that negotiations between Lexmark and BDT were terminated before the parties reached an agreement:

Q. If a development and manufacturing agreement had been entered into between BDT and Lexmark, as account manager, you would have known about it; correct?

A. I should have known about it, yes.

Q. And to your knowledge, one was not entered into; correct?

A. Not finalized, no.

Q. A contract had been discussed, negotiations had occurred, and then negotiations had been canceled prior to the execution of such agreement; correct?

A. That's my understanding.

As outlined above, to establish a contract implied-in-fact there must be clear and convincing proof "that there was in fact an agreement, positively definite and mutually understood." *Veluzat*, 462 S.W.2d at 196–97. Not only has BDT failed to produce such clear and convincing proof, but also BDT's principals affirmatively testified that there was no meeting of the minds. At most, the evidence establishes that the parties negotiated the terms of a possible business arrangement and that BDT was very optimistic about concluding an agreement. As noted by Judge Heyburn in *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 790 (W.D.Ky.2001), however, "[o]ptimism alone, however, cannot create binding obligations." Because there was no meeting of the minds, much less clear and

convincing proof thereof, there is no implied-in-fact contract. For this reason, Lexmark is entitled to summary judgment on BDT's first cause of action.

■ Alternatively, Lexmark is entitled to summary judgment on BDT's first cause of action because the alleged agreement violates the Statute of Frauds. According to BDT, the subject of the parties' preliminary negotiations was a possible contract pursuant to which BDT would develop, manufacture, and sell input and output devices for certain of Lexmark's printers. Although, as BDT admits, the parties never agreed to the terms of such a contract, had they done so, their agreement would have been a contract for the sale of goods subject to Article 2 of Kentucky's Uniform Commercial Code. Article 2 contains a statute of frauds provision that provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

KRS § 355.2–201(1). As noted by the Kentucky Court of Appeals, the statute requires a signed writing "to provide evidence of a contract." *Lonnie Hayes & Sons Staves v. Bourbon Cooperage Co.*, 777 S.W.2d 940, 942 (Ky.Ct.App.1989); *see also*

*Walker v. Keith*, 382 S.W.2d 198, 203–04 (Ky.1964) ("The purpose of requiring a writing to evidence an agreement is to assure certainty of the essential terms thereof and to avoid controversy and litigation.")

In this case, there is no writing signed by Lexmark sufficient to indicate that the parties entered into the alleged contract. As discussed above, the parties exchanged incomplete drafts of a potential agreement. The last two drafts exchanged by the parties included many blanks, did not contain key exhibits or key terms, included proposed modifications, and were not signed or dated by any party. The cover memo from Lexmark accompanying the earlier draft stated that Lexmark was providing the draft "for initial review" by BDT. BDT in the cover letter to its counter-proposed draft requested Lexmark to "review [its] 'Development and Manufacturing' proposal agreements." (emphasis added).

Far from "indicat[ing] that a contract for sale has been made between the parties," as the statute requires, these draft proposals reflect on-going negotiations and the absence of a meeting of the minds. Further, although the drafts have designated signature blocks for the parties to manifest their assent to the terms of the proposed contracts, neither draft was signed or dated by a single party. These draft proposals clearly do not satisfy the statute of frauds requirement of Article 2. For this reason as well, Lexmark's first claim must fail.

**B. PLAINTIFFS' THIRD CAUSE OF ACTION[4]**

■ Plaintiffs' third cause of action amounts to a suit under the Kentucky

---

**4.** It is helpful to consider Plaintiffs' third cause of action, a claim under the Kentucky Uniform Trade Secrets Act ("KUTSA"), in light of the following relevant statutory language:

365.880 Definitions

. . .

(2) "Misappropriation" means:

. . .

Uniform Trade Secrets Act ("KUTSA"), KRS § 365.880 et seq.[5] "In order to prevail on a breach of the Uniform Trade Secrets Act claim, Plaintiffs must present evidence which satisfies a two prong inquiry. First, they must present evidence which indicates that the information they seek to protect qualifies as a protectable trade secret." *In re Dippin' Dots Patent Litigation,* 249 F.Supp.2d 1346 (N.D.Ga.2003)(citing *Auto Channel, Inc. v. Speedvision Network, LLC,* 144 F.Supp.2d 784, 794 (W.D.Ky.2001)). "To show the information is entitled to protection, Plaintiffs must put forward evidence demonstrating that the information (1) has independent economic value, (2) is not readily ascertainable by proper means, and (3) was the subject of reasonable efforts to maintain its secrecy." *Id.* (citing KRS § 365.880). In the instant case, the subject of Defendant's challenge is the last of these.

But, of course, it is not enough merely to show that the information is entitled to protection. Rather, Plaintiffs must also show that the protected information has been misappropriated. "To prove misappropriation, Plaintiffs must show that the trade secret was acquired by improper means, was disclosed improperly, or was used by someone without proper consent." *Id.* (citing KRS § 365.880).

For the reasons that follow, the Court finds that (1) because Plaintiffs did not take reasonable efforts under the circumstances to maintain the subject information's secrecy, the subject information does not qualify as a "trade secret" under KRS § 365.880(4)(b); and (2) even assuming, arguendo, that the subject information qualifies as a trade secret under the statute, that information was not misappropriated.

1. The Subject Information is Not a "Trade Secret" Under KRS § 365.880(4).

■ To qualify as a trade secret, BDT must demonstrate that the technology at issue:

 (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

 (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

KRS § 365.880(4); *see, e.g., Courtesy Temporary Service, Inc. v. Camacho,* 222 Cal. App.3d 1278, 1286–87, 272 Cal.Rptr. 352 (1990).

BDT cannot establish that the information at issue here constitutes a legally cognizable trade secret. BDT disclosed the entirety of the alleged trade secrets to Hewlett Packard and Tektronix from 1993 through May 1994 without securing protection for these disclosures, and the BDT System lost any trade secret protection it

---

 (b) Disclosure or use of a trade secret of another without express or implied consent by a person . . . .

 . . .

(4) "Trade secret" means information, including a formula, pattern, compilation, program, data, device, method, technique, or process, that:

 . . .

 (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

 Defendant's summary judgment motions argue that, on the undisputed facts of this case, these sections bar Plaintiffs' third cause of action.

**5.** Although there is a paucity of Kentucky decisions applying the KUTSA, "because KUTSA is a uniform law . . . decisions in other jurisdictions provide guidance for its application and construction." *Auto Channel, Inc.,* 144 F.Supp.2d at 788.

may have had at that time. Yet, as noted above, BDT did not disclose to Lexmark several of the components required to constitute the BDT System combination trade secret until August 1994 and February 1995. Thus, the BDT System ceased to be a trade secret even before BDT fully disclosed it to Lexmark.

BDT's misappropriation claim fails because BDT did not take reasonable steps to maintain the secrecy of its alleged trade secrets. It is axiomatic that without secrecy, no trade secret can exist. As the United States Supreme Court explained, once a trade secret is disclosed to "others who are under no obligation to protect the confidentiality of the information, or [is] otherwise publicly disclose[d] ..., [the] proprietary right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). *See, e.g., Secure Services Technology Inc. v. Time & Space Processing, Inc.*, 722 F.Supp. 1354, 1359–62 (E.D.Va.1989) (applying California law, district court held that sale by Plaintiff of secure facsimile machine to federal government without restrictions prohibiting use of secret communication protocols waived trade secret status because Plaintiff did not adequately protect trade secrets); *S & S Enterprises, Inc. v. Hubert*, 169 U.S.P.Q. 611, 1971 WL 16697 (Cal.App. 5 Dist.1971)(defendants not liable for misappropriation when plaintiff, among other things, disclosed trade secrets at an iPdustry conference). "The inquiry simply boils down to the question: was this information truly a secret?" *Penalty Kick Mgmt., Ltd. v. The Coca–Cola Co.*, 164 F.Supp.2d 1376, 1380–81 (N.D.Ga. 2001).

A failure to require a third party to enter a confidentiality agreement to protect alleged trade secrets is one clear way to waive any trade secret protection that might exist. *See, e.g., Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 795 (W.D.Ky.2001) (plaintiffs waived any possible trade secret protection when they sent alleged trade secret television pilot concepts as unsolicited promotional materials to cable networks, with no requirement of secrecy); *BioCore, Inc. v. Khosrowshahi*, 96 F.Supp.2d 1221, 1232 (D.Kan.2000)(no protection where Plaintiffs' marketing materials, provided without confidentiality requirements, included results of efficacy studies claimed as trade secret). Entering into an agreement, but placing few or no restrictions on the uses a third party can make of a trade secret, is another sure path to waiver. *See, e.g., Contracts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F.Supp.2d 520, 534 (D.Md.2001)(plaintiffs entered into agreement that placed no restrictions on the uses defendants could make of alleged trade secrets). Thus, as set forth below, any proprietary interest BDT might have had in the BDT System or the other related trade secrets was extinguished when BDT revealed its trade secrets to third parties without requiring those parties to keep that information a secret.

As discussed above, it is undisputed that BDT disclosed all of its purported trade secrets embodied in its BDT System to both Hewlett Packard and Tektronix under "one-way" confidentiality agreements that only protected the confidences of Hewlett Packard and Tektronix, respectively, not those held by BDT. Those agreements did not obligate either Hewlett Packard or Tektronix to keep confidential any information that BDT disclosed. According to the testimony of Hewlett Packard, and as confirmed by the documents produced by both BDT and Hewlett Packard, BDT disclosed the entirety of the BDT System (including the Teflon Guide Finger) to Hewlett Packard by no later than May 1994. Through these unprotected disclosures, BDT removed any trade

secret protection its BDT System or the other alleged trade secrets might have had.

Such disclosures to Hewlett Packard and Tektronix without reasonable efforts to maintain secrecy nullifies any claim that BDT might have had for trade secret protection. In a case decided under the Maryland version of the UTSA, a district court granted Defendant's motion for summary judgment on a trade secret misappropriation claim under the very same circumstances. In holding that Plaintiff had failed to demonstrate that it had made reasonable efforts to maintain secrecy, the district court noted that none of the several agreements at issue in the case "restrict[ed] [Defendant] from disclosing the information. In fact, the R & D Agreement only requires [Plaintiff] ... to maintain secrecy and confidentiality. No similar restriction is placed on [Defendant]." *Contracts Materials Processing, Inc. v. Kataleuna*, 164 F.Supp.2d 520, 534 (D.Md. 2001).

Similarly, in another case applying the UTSA, the Fifth Circuit noted that when the holder of the trade secret disclosed his improvement to a motorcycle exhaust system to representatives of Yamaha, he waived trade secret protection by failing to take reasonable efforts at secrecy. *Sheets v. Yamaha Motors Corp.*, 849 F.2d 179, 183–84 (5th Cir.1988). As the Fifth Circuit wrote: "A disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right of the trade secret." *Id.* Numerous other courts have made similar holdings. *See, e.g., FSI Int'l, Inc. v. Shumway*, 2002 WL 334409, *9 (D.Minn.2002)(because employees had ability to disclose trade secrets on a "need-to-know" basis to third parties not required to sign a confidentiality agreement, Plaintiff had not taken reasonable efforts to maintain secrecy); *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F.Supp.2d 770, 779–80 (C.D.Ill.2000)(failure to require secrecy of contractors and joint venturer negated trade secrecy, even though each individual contractor was only privy to a small part of the trade secret that was the larger, allegedly secret system); *Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F.Supp.2d 460, 476, 480 (D.Md.1999)(disclosure of business plan to potential investors without agreement of secrecy was "inconsistent with recognition of the document as a trade secret").

The same result obtains in the instant case. The undisputed evidence shows that BDT failed to obligate Hewlett Packard or Tektronix to keep the BDT System (or other alleged trade secrets) secret—and BDT therefore forfeited any grounds to now claim trade secret protection. Accordingly, BDT's disclosures to Hewlett Packard and Tektronix of the entirety of the BDT System, without the protection of confidential disclosure agreements that protected BDT's proprietary rights, erased and extinguished any viable trade secret that might have existed. As the foregoing cases make clear, BDT's execution of numerous agreements that protected information disclosed by Hewlett Packard and Tektronix, but that did not afford any protection for information disclosed by BDT, is the antithesis of "reasonable efforts" to maintain secrecy.

Plaintiffs' counter-argument to Defendant's allegations that Plaintiffs in their dealings with HP and Tektronix failed to take reasonable steps to preserve secrecy is that, though the written agreements between Plaintiffs and HP and Tektronix protected only HP and Tektronix—not Plaintiffs—these organization were nonetheless *impliedly* obligated to maintain secrecy. In other words, Plaintiffs argue, the absence of an express duty does not mean that a duty cannot arise by implication.

■ The case law, however, supports the opposite conclusion, and this Court is of the opinion that any questions about the existence of any implied duty of confidentiality in circumstances where there is an express agreement between the parties (protecting one party, but not the other) were answered by the United States District Court for the Northern District of Georgia in *In re Dippin' Dots Patent Litigation,* 249 F.Supp.2d 1346 (N.D.Ga.2003)(applying KUTSA). In *Dippin' Dots,* the Northern District of Georgia—in a case factually indistinguishable in all material respects—flatly rejected the notion of an implied duty of confidentiality for claims brought under the Uniform Trade Secrets Act. Addressing Plaintiffs' contention that "there was an implied duty on Defendants to maintain the secrecy of Plaintiffs' protected information," the District Court in *Dippin' Dots* answered to the contrary. "[T]he lack of a confidentiality agreement between the parties obviates Plaintiffs Uniform Act claims." *Id.* at 1376. The Court arrived at this conclusion because the Uniform Act focused "on whether a plaintiff used reasonable efforts to protect the confidentiality of its putative trade secrets. Because simple measures, such as identifying materials as trade secret and using a written confidentiality agreement, are available to protect sensitive information, the Uniform Act will not imply a confidential relationship between parties." *Id.* 1376–77. The Court granted summary judgment on this basis.[6]

Thus, for the reasons outlined above, because Plaintiffs failed to secure written confidentiality agreements with HP and Tektronix, it cannot be said that Plaintiffs took reasonable steps to ensure the privacy of the subject information. Because Plaintiffs failed to take such reasonable steps, the subject information does not qualify as a "trade secret" under KUTSA. Because the information cannot be considered a "trade secret," Plaintiffs third cause of action for misappropriation must fail.

**2. Even Assuming that the Information *Is* a Trade Secret under KUTSA, the Parties' Multiple Agreements Permitting Unrestricted Use of Information by BDT to Lexmark Negates Any Purported Misappropriation**

■ Even assuming that BDT can establish it had enforceable trade secrets, to recover on its trade secrets claim BDT must prove that Lexmark misappropriated those trade secrets. KRS § 365.880(2). Thus, BDT must be able to show that Lexmark used the alleged trade secrets "without express or implied consent," despite knowing or having reason to know that it acquired knowledge of the alleged trade secrets "under circumstances giving rise to a duty to ... limit [their] use." KRS § 365.880(2)(b). As set forth above, the parties' many agreements concerning confidential information expressly permitted Lexmark to use any information provided by BDT. These agreements and this permission is the equivalent of "express or

---

**6.** Also factoring significantly into the *Dippin' Dots* court's decision—and factoring significantly in this Court's decision as well—is the recognition that, though there exists a line of cases supporting the idea of an implied duty, the "doctrine of an implied duty to maintain *confidences comes out of a line of cases* which ... [do] not arise under the Uniform Act." *Dippin' Dots,* 249 F.Supp.2d at 1376. Other courts have made similar observations. For example, the United States District Court for the Eastern District of Michigan in *Rogers*

*v. Desa Int'l, Inc.,* 183 F.Supp.2d 955, 958 (E.D.Mich.2002), remarked that while a few pre-UTSA cases may "contain language supporting the concept of an implied duty of confidentiality, counsel could point to no case in which such an implication was enough under the Uniform Trade Secret Act." Likewise, Plaintiffs in the instant case do not (and cannot) provide any UTSA authority to support the proposition that HP or Tektronix had an implied agreement to keep Plaintiffs' technology confidential.

implied consent." In view of the relationship and understandings established by these agreements, Lexmark simply cannot be found to have knowingly used any BDT trade secret in contravention of a "duty to ... limit its use." KRS § 365.880(2)(b).

As set forth above, between 1990 and 1996, Lexmark and BDT entered into no less than seven confidentiality agreements. While these seven agreements are not identical, all seven expressly provide that Lexmark was free to use any information BDT disclosed to Lexmark, even if BDT designated that information as confidential. Lexmark was also expressly free to disclose any such information to the extent disclosure occurred through the marketing of Lexmark's own products. Over this six year period, based upon the numerous express contracts between Lexmark and BDT, Lexmark had a clear and reasonable understanding that it was free to use any information disclosed by BDT.

BDT not only willingly executed the agreements, it even cited and relied on those very same agreements in the Verified Complaint at the inception of this dispute, as well as in several later amended complaints. For example, after referring to the execution of the parties' first two "Confidential Disclosure Agreements," BDT's president, Glenn Klein, swore under oath that: "In accepting and utilizing such technology from BDT, Lexmark affirmed, both expressly and implicitly, the Confidential Disclosure Agreements between the two companies." Several paragraphs later, Mr. Klein further swore that: "After BDT's demonstration in Lexington in May 1993, both BDT and Lexmark, pursuant to Dr. Curlander's request, executed their first two-way Confidential Agreement, which confirmed that BDT could disclose its trade secrets in confidence to Lexmark." Id. at ¶ 15. Likewise, BDT's president further swore under oath that: "[P]ursuant to its various Confidential Dis-

closure Agreements ... BDT disclosed those valuable trade secrets to Lexmark...." Id. at ¶ 43. BDT's president also swore under oath that:

> In early 1994, BDT and Lexmark amended their prior Confidential Disclosure Agreements to expressly cover particular BDT products related to paper input and paper output systems. *Pursuant to those agreements* ... BDT continued to disclose to Lexmark's engineers its confidential technology, trade secrets and general paper handling know-how. BDT also continued to provide Lexmark with samples of its redesigned prototypes for in-house evaluation and testing by Lexmark's engineering staff.

Id. at ¶ 17 (emphasis added). BDT repeated all four of these admissions in two subsequent complaints filed in 1998 in the Southern District of California and the Central District of California.

In 1999, Lexmark pointed out to BDT that the written agreements cited in BDT's complaints unassailably establish that Lexmark was free to use any information furnished to it by BDT. Soon thereafter, by way of the amended complaint in this case, BDT excised all eleven of its references to the written confidentiality agreements from its complaint. BDT's revision of the complaint, however, cannot erase the numerous admissions under oath that undermine its case.

Because it is undisputed that the parties repeatedly entered into confidentiality agreements that expressly and unambiguously disclaimed any restrictions on Lexmark's use of information provided by BDT, it is axiomatic that no express or implied duty restricting Lexmark's use of such information can be found here. See MILGRIM ON TRADE SECRETS § 3.03 (Matthew Bender & Co.2002) ("[E]xpress disclaimer by the disclosee of a confidential

relationship from the outset will dispel the existence of such a relationship."); TRADE SECRETS—A PRACTITIONER'S GUIDE, Ch. 6, Express Disclaimers (Practicing Law Institute 2002) ("Parties may expressly disclaim a confidential relationship. When parties enter a valid contract of this sort, confidentiality obligations are negated between the parties, and trade secrets communicated during the relationship may be used or disclosed freely.").

Indeed, at least one court has questioned whether Kentucky's Uniform Trade Secrets Act *ever* permits the imposition of an implied duty of confidence—even where the parties have executed no agreement on the subject. *See Rogers v. Desa Intl., Inc.,* 183 F.Supp.2d 955, 957–58 (E.D.Mich. 2002). BDT's sworn admissions reveal and confirm that it disclosed the alleged trade secrets to Lexmark pursuant to the seven confidentiality agreements. Those seven agreements all expressly provide that Lexmark was free to use the information communicated by BDT and removes any possibility that Lexmark had an implied duty not to use BDT's confidential information. *See, e.g., Burten v. Milton Bradley Co.,* 763 F.2d 461, 463–64 (1st Cir.1985) ("An implied confidential relationship can be defeated ... if the parties, by agreement, expressly disclaim such a relationship.")

Nevertheless, BDT now alleges that the parties also executed one additional confidentiality agreement that did not contain the same disclaimer of use restrictions that all of the parties' other written confidentiality agreements contained. According to BDT, in March 1993 one of Lexmark's former employees, John Brown, signed a confidentiality agreement at a technology fair (called CeBit) in Hannover Germany. BDT asserts that this purported agreement contained a restriction on Lexmark's use of information provided by BDT, in contradiction of all the other confidentiali-

ty agreements that were entered into by the parties both before and after the alleged 1993 Hannover confidentiality agreement. Mr. Brown, who left Lexmark two years before this lawsuit was filed, and the other Lexmark employees who were with Mr. Brown in Germany in 1993 when he allegedly signed the Hannover confidentiality agreement, steadfastly deny BDT's allegation that any such agreement was signed by Lexmark or even proposed by BDT.

BDT claims that the alleged 1993 Hannover confidentiality agreement and any copies thereof were misplaced during an office move. This assertion stands in stark contrast to the fact that although both BDT and Lexmark were able to locate during the course of discovery multiple copies of every single one of the seven existing confidential disclosure agreements and confidential exchange agreements entered into by the parties, neither party has been able to produce even a single copy of the 1993 Hannover confidentiality agreement.

Simply put, BDT is unable to prove the existence of the 1993 Hannover confidentiality agreement. Given that BDT does not have a copy of the agreement to introduce at trial, it will, by necessity, be forced to prove the existence and contents of the agreement via oral testimony. Kentucky law, however, does not permit this.

 BDT must establish sufficient proof of a valid and enforceable contract. Federal courts in diversity cases look to applicable state law for such criteria, including the requisite level of proof. Kentucky law requires that the evidence necessary to establish a lost writing "must be clear and satisfactory." *Suter v. Suter,* 278 Ky. 403, 128 S.W.2d 704, 706 (1939). Indeed, Kentucky courts have approvingly quoted the early decision of the United

States Supreme Court in *Tayloe v. Riggs* on the same subject:

> When a written contract is to be proved, not by itself but by parole testimony, no vague uncertain recollection concerning its stipulations ought to supply the place of the written instrument itself. The substance of the agreement ought to be proved satisfactorily; and if that cannot be done, the party is in the condition of every other suitor in Court, who makes a claim he cannot support. When parties reduce their contract to writing, the obligations and rights of each are described, and limited by the instrument itself. The safety which is expected from them, would be much impaired, if they could be established upon uncertain and vague impressions made by a conversation antecedent to the reduction of the agreement.

*Arrington v. Sizemore*, 241 Ky. 171, 43 S.W.2d 699, 704 (1931) (quoting *Tayloe v. Riggs*, 26 U.S.(1 Pet.) 591, 600, 7 L.Ed. 275 (1828)). The deposition testimony provided by BDT concerning the alleged 1993 Hannover confidentiality agreement falls well short of what is necessary to survive summary judgment under Kentucky's heightened standard of proof. To avoid summary judgment, BDT must point to evidence in the record upon which a reasonable juror could find by "clear and satisfactory" proof that the Hannover confidentiality agreement had been executed and the specific terms of the agreement were reasonable clear. BDT cannot do that because the testimony of its witnesses has been able to provide, at best, only the "vague uncertain recollection" of the agreement that the Kentucky court have found insufficient. In fact, the only BDT witness who remembers anything about the contents of the alleged 1993 Hannover confidentiality agreement has completely contradicted himself concerning key aspects of the agreement.

When BDT was first questioned about the alleged 1993 Hannover confidentiality agreement, it was able to provide very little detail concerning the terms thereof. During a deposition taken in July 1999, six years after the alleged 1993 Hannover confidentiality agreement was signed, Mr. Klein (the BDT president who signed all seven of the known Lexmark/BDT confidentiality agreements discussed above) testified that the 1993 Hannover confidentiality agreement: (1) was a short, one page document; (2) had only two enumerated paragraphs; (3) only required Lexmark not to disclose BDT's information; (4) listed all of BDT's new products and technology that were to be governed under the agreement; (5) was executed before BDT's trade secrets were shown to Lexmark. Mr. Klein also testified that a copy of the agreement was taken by John Brown, who purportedly signed the agreement on behalf of Lexmark. This testimony constituted everything of substance that Mr. Klein recalled about the 1993 Hannover confidentiality agreement.

Three years later, in 2002, Mr. Klein testified again about the lost 1993 Hannover confidentiality agreement. This time Mr. Klein actually remembered significantly more about that agreement, most of which was inconsistent with his testimony in 1999.

Specifically, Mr. Klein first testified in 1999 that the agreement consisted of "two paragraphs on a page," yet in 2002 he testified that the agreement contained a preamble and "five or six" line items set out in separate enumerated paragraphs. In 1999, Mr. Klein failed to recall any choice-of-law provision in the agreement, yet he testified in 2002 that the last paragraph in the document had a German choice-of-law provision. Similarly, Mr. Klein did not mention any provisions concerning "software codes" or unissued pat-

ents when he testified in 1999, but he somehow recalled in 2002 that there was some mention of unissued patents as well as "a paragraph stating something about software codes." Mr. Klein also testified in 1999 that Mr. Brown signed the document before viewing BDT's purported trade secrets, but he testified in 2002 that Mr. Brown signed the document only after viewing the trade secrets.

Finally, even as to the element of the agreement that is the most critical to BDT's strained argument, the express use restriction purportedly placed upon Lexmark by way of the 1993 Hannover confidentiality agreement, Mr. Klein's testimony was inconsistent. In 1999, Mr. Klein testified that the 1993 Hannover confidentiality agreement provided only that Lexmark "would not disclose" BDT's information, while in 2002 he provided testimony more consistent with BDT's current theory, claiming that the 1993 Hannover confidentiality agreement required that BDT's information "be held confidential and for the use only of BDT." Thus, even as to the ultimate provision in the purported 1993 Hannover confidentiality agreement, BDT's witness contradicted himself. It follows that BDT has failed to prove by clear and substantial evidence the obligations to which Lexmark allegedly agreed in Germany in 1993.

Mr. Steinhilber, who allegedly drafted and signed the 1993 Hannover confidentiality agreement, remembers virtually nothing about it except "the general proposition as to what it was to cover." Also, as mentioned above, the former Lexmark employee who allegedly signed that agreement in fact denies its very existence.

Given the inconsistent nature of BDT's proffered testimony, the Court finds that the evidence of the lost agreement is nothing more than the kind of "vague uncertain recollection" that Kentucky courts find insufficient as a matter of law. In-

deed, BDT's vague collective recollection provides little insight into the specific terms of the lost 1993 Hannover confidentiality agreement and is almost completely internally inconsistent. Under these circumstances, BDT cannot establish the existence or contents of the lost 1993 Hannover confidentiality agreement by "clear and satisfactory" proof. *See e.g., Rash v. Peoples Deposit Bank & Trust Co.,* 192 F.2d 470 (6th Cir.1951) (stating that, under Kentucky law, "where evidence is contradictory on the part of witnesses for the same party, where assumed recollection of specific facts after the lapse of years taxes the credulity of a court or is shaken by what we have called 'destructive analysis', it fails to meet the test required to establish a lost agreement"); *M. P. Brothers Co. v. Kirkpatrick,* 214 Ky. 560, 283 S.W. 424, 425–26 (1926) ("clear and satisfactory proof" requirement not met where testimony of "reputable businessmen" from both parties was at odds).

Because BDT cannot satisfactorily establish the existence or terms of the alleged 1993 Hannover confidentiality agreement upon which it relies, BDT has no basis upon which to argue that the alleged agreement prevented Lexmark from using the information disclosed to it. Moreover, the seven other written agreements entered into and produced by the parties all expressly and unambiguously disclaim any restriction on Lexmark's use of information received from BDT. For these reasons, even assuming that the information at issue may be considered a "trade secret" under KUTSA, that trade secret was not misappropriated and Lexmark is entitled to summary judgment.

BDT attempts to skirt the problem presented by the parties' agreements by noting that it "corrected" the "misimpression" that the agreements applied to the disclosures at issue in this case at the deposition

of its representative and by amending its pleading. The agreements do not in fact apply, argue Plaintiffs, and—to the extent the question is debatable—the question is one for a jury.

The problem, however, is that Plaintiffs original position in this litigation was that the disclosed information *was* protected by the parties agreements (i.e., that the agreements *did* apply). In accord with this position, Plaintiffs' initial testimony was in accordance with this view. For example, Plaintiffs in their initial verified pleadings respecting the parties May 11, 1993 "two-way" Confidentiality Exchange Agreement, No. 4746, are explicit in alleging that they disclosed their alleged "secrets" to Lexmark pursuant to the terms of that agreement. Wrote Plaintiffs: "After BDT's demonstration in Lexington in May of 1993, both BDT and Lexmark, pursuant to Dr. Curlander's request, executed their first two-way Confidential Disclosure Agreement, which confirmed that BDT could disclose its trade secrets in confidence to Lexmark." Verified Complaint, at ¶ 15.

To be sure, Plaintiffs have the right to amend their complaint and to argue alternative legal theories. *They do not, however, have the right to amend their sworn testimony so as to create a genuine issue of fact. See Penny v. United Parcel Service*, 128 F.3d 408, 417 (6th Cir.1997)(noting that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony"); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir.1986). Plaintiffs' latest position—that is, that the parties' agreements do *not* apply—is in the abstract a valid legal position, but, to the extent that Plaintiffs attempt to support it by proferring testimony inconsistent with earlier testimony, it lacks evidentiary support.

Plaintiffs' other argument—that Plaintiff Buro–Datentechnik GMBH & Co. KG (Buro–Datentechnik) was not explicitly a party to the written agreements with Lexmark and therefore is not bound by the disclosure terms of those agreements—fails for similar reasons. Specifically, Plaintiffs' Verified Complaint and other pleadings repeatedly acknowledged that those agreements bound *both* Plaintiffs and that *both* Plaintiffs disclosed their alleged secrets pursuant to those agreements. Also, Plaintiffs' Answer to Lexmark's counterclaim admitted that both Plaintiffs were parties to those agreements.

## IV. CONCLUSION

In the first instance, because Plaintiffs' failed to take reasonable steps to insure the secrecy of their information (namely, entering into a written confidentiality agreement) Plaintiffs' disclosed information is not a "trade" secret under the KUTSA. Even assuming that the information qualifies as a trade secret, however, Defendant's use of the information was protected by the parties' multiple agreements and as such was not misappropriated. Summary judgment is therefore appropriate.

Accordingly,

**IT IS ORDERED** that Defendant's motions for summary judgment [Record Nos. 304 and 305] be, and the same hereby are, **GRANTED**.